[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14044

_____

D.C. Docket No. 2:13-cv-02183-MHH

SOUTH GRAND VIEW DEVELOPMENT COMPANY, INC.,

Plaintiff-Appellee,

versus

CITY OF ALABASTER, ALABAMA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 21, 2021)

Before WILSON, BRANCH, and JULIE CARNES, Circuit Judges.

BRANCH, Circuit Judge:

This appeal arises from a jury verdict finding that a city's rezoning of a land developer's property constituted a regulatory taking without just compensation under the Fifth Amendment to the U.S. Constitution.[1]  The plaintiff, South Grande View Development Co.[2] ("SGV"), received an award of approximately $3.5 million against the defendant, the City of Alabaster ("the City").

The City raises several issues on appeal, namely: (1) whether the just compensation claim was ripe for trial, (2) whether the district court improperly allowed evidence regarding the city's motivation for enacting the zoning ordinance, and (3) whether the district court erred in admitting and excluding certain other types of evidence.  After careful review of the record and the law, and with the benefit of oral argument, we affirm.

## I. Background

SGV is a real estate development company.  In 1994, SGV bought approximately 547 acres of land in the City of Alabaster for $1.65 million.  The Master Plan for the development was submitted to and approved by the City in

---

[1] We refer to a claim alleged under the Fifth Amendment for a regulatory taking without just compensation as a "just compensation" claim throughout this opinion.

[2] The docket below misspelled the plaintiff's name—"South Grand View" instead of "South Grande View."  We are not at liberty to change the case caption; however, we use the correct spelling in the text of our opinion.

1995, and was zoned as R-2 (90-foot wide single-family residences), R-4 (60-foot wide garden homes), and R-7 (townhomes).  Most of the development was completed by 2008, but the 142-acre portion of the land at issue in this lawsuit, Sector 16, was one of the last phases of the development.  Sector 16 was zoned predominantly for R-4 and R-7 with a small part as R-2.[3]  On December 5, 2011, however, the city rezoned Sector 16 for R-2 lots only.

Accordingly, in December of 2013, SGV filed a lawsuit against the City pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1988, alleging that the City had violated its rights under the Fifth Amendment because the rezoning "constitute[d] an unlawful taking of [its] property without just compensation therefor" and under the Fifth and Fourteenth Amendments for denial of procedural and substantive due process for the same taking.[4]

Before trial, both parties filed several motions *in limine*.  Relevant to this appeal, the City moved to exclude any evidence challenging the zoning regulations

---

[3] The portion of the purchase price for the 142 acres in Sector 16 was around $433,000.

[4] The substantive due process claim alleged that "[t]he City has infringed upon [SGV]'s property interest in an arbitrary, capricious and irrational manner."  The procedural due process claim alleged that the City took SGV's "property without providing a mechanism for just compensation under State law for a regulatory taking" and failed "to provide adequate notice of the change in zoning."

The Court granted the City's motion to dismiss the substantive due process claim as subsumed by the procedural due process claim.  After limited discovery into the process by which the ordinance was passed, the district court granted the City's motion for summary judgment on the procedural due process claim.  Only the just compensation claim went forward.

3

as arbitrary and capricious, arguing that such evidence is irrelevant in a just compensation case. The City also moved to exclude any evidence regarding the value of SGV's property as "lots," since they were not legally lots at the time the ordinance was passed. SGV moved to exclude any evidence regarding foreclosures of SGV property after the date of the ordinance.

The district court denied the City's motions and granted SGV's. First, the court noted that, in a just compensation case, the factfinder may consider evidence relating to the reason for the regulatory action to demonstrate that the decision was arbitrary. Second, the court ruled that SGV would be allowed to produce alternate methods of calculation for damages, such as "the cost of preparing the property at issue for R-4 lots," if a fair market value was too difficult to ascertain on the date of the alleged taking. Finally, the court found that evidence regarding the damages in a just compensation case revolved around the query "what has the owner lost?" at the time of the taking. For this reason, the court allowed the City to introduce evidence regarding encumbrances on the property in existence at the time the ordinance was passed but not after.

The City then filed a motion to reconsider the court's pretrial ruling, reiterating its objections to evidence of the City's motive in passing the ordinance and the "lot method" valuation of the property. For the first time, the City also

4

argued that the case was not ripe for adjudication, since SGV had not sought variances from the zoning ordinance.

The morning of trial, the court heard argument on the ripeness issue. The court found that the question was addressed squarely by Eleventh Circuit precedent, which held that a zoning ordinance was a final matter which could be adjudicated.[5] The court also noted that the city had not rezoned the property back to its original R-4 designation since the commencement of the lawsuit (a period of about four years) which indicated the City's decision was final.

The evidence at trial, as relevant to this appeal, was largely undisputed. Kyle Wood, an engineer who consulted on the initial layout of Sector 16, testified that the site was originally zoned to have 321 R-4 or R-7 residences, with only 13 R-2 lots. SGV commissioned a plan that was primarily for R-4 lots, with only the originally-zoned thirteen R-2 lots being built as R-2s. Wood testified that SGV "mass graded" (*i.e.,* graded all at once) Sector 16 for R-4 lots, as compared to grading for R-2 lots which would have been individually graded. Wood also

---

[5] In *A.A. Profiles, Inc. v. City of Ft. Lauderdale*, 850 F.2d 1483, 1487 (11th Cir. 1988) (hereinafter *A.A. Profiles I*), this court found that a "rezoning ordinance was a final decision by the City with respect to appellant's property" and therefore held that the case was ripe for adjudication.

provided testimony that it was not financially feasible to convert the lots to comply with the new zoning ordinance.[6]

The jury heard testimony from David Cox, owner of a local residential and commercial construction company, that he previously was in a contract with SGV for 60 R-4 lots in 2005.  He also testified that, if SGV had put those lots on the market again in 2011, he would have been interested in purchasing them for over $40,000 a lot, assuming certain infrastructure was put in place.  Cox had no interest in purchasing R-2 lots.

SGV called multiple current and former representatives from the City to testify.  The former chairman of the planning and zoning board of Alabaster, Robert Shinpaugh, testified that this incident with SGV was the sole incident he could remember where the City had requested a rezoning from a previous zoning decision.  The former chairman also testified that the board had been unaware of certain economic and geographic aspects of the property when it was rezoned.[7]

---

[6] To convert the R-4 graded lots into R-2 lots, SGV had two options.  First, SGV could merge every other R-4 lot into its neighbor, thereby cutting the lots in half but making the requisite plot size.  The problem with that method, Wood said, was that the lot shape would require the house to be turned sideways to the street.  The second method also involved having fewer lots but included bringing in additional dirt and a retaining wall to lengthen the amount of flat land available for building, which would add "considerable expense."  Wood estimated that this re-grading would cost $3.2 million dollars.

[7] Specifically, the jury heard that when the board made its recommendation to rezone, Shinpaugh had not seen the property; was unaware of the grading work SGV had already done; did not discuss the impact of rezoning economically; did not consult the city engineer to see if it was feasible to construct R-2 homes on that topography; could not remember who submitted the application to rezone or why he signed it; and was generally unfamiliar with real estate

The City's mayor at the time relevant to this dispute testified that three people spoke against the rezoning at the Alabaster city council meeting where the ordinance was adopted. One of those people was the then-owner of SGV. A city council member, Tommy Ryals, testified that Sector 16 was originally zoned according to a master plan put out by the City. Ryals also testified regarding the City's motivation for the rezoning.[8]

The final witness that SGV called was Concetta Givianpour, the current owner of SGV. She testified that Sector 16 was the last sector of the purchased property to be developed. For years, SGV displayed in their sales center their master plan for the entire property, which for Sector 16 included only R-4 homes. In other words, they "made it known publicly" that Sector 16 was reserved for R-4 garden homes. Givianpour also testified that SGV obtained a permit to develop the land from the Alabama Department of Environmental Management (ADEM), and

development practices. On cross, Shinpaugh clarified that the zoning board did not typically consider the economic impact of its zoning regulations, and that some of the current residents of the neighborhood next to which Sector 16 was located supported the zoning change.

[8] According to Ryals, the City was rezoned in order to avoid any townhomes (R-7) being built on the property. The City was aware that SGV planned only to build R-4 and R-2 homes but was worried that there would be a foreclosure and a change in ownership. Ryals spoke of the rezoning as simply a "starting point" to negotiate with the owner. On cross, Ryals testified that, in his opinion, the preliminary plat submitted by SGV in 2006 was rejected because there was not a second entrance, and that no revised preliminary plat was submitted by SGV thereafter. Ryals also testified about a letter from 2004 in which the City committed to "support" SGV's request to rezone the R-7 portion of its property to R-4 as a result of discussions between SGV's owner and the City.

another permit from the City of Alabaster to clear and grade Section 16, in December of 2011, just before the zoning ordinance was passed.

Besides the purchase price, Givianpour testified that SGV, by 2008, had spent a total of $3,532,849.19 to develop Sector 16. Givianpour explained that the reason SGV did not finish developing Sector 16 for several years was because the 2008 recession hit the development industry, and they were going to wait until after the recession to continue developing. Givianpour testified that, by the end of 2011, she saw the Alabama market returning.

Givianpour testified that R-4 and R-7 are "highly coveted" zoning designations for a builder. By contrast, building R-2s was not economically feasible because it would require greater expenditures, would result in half the number of lots they expected to have, and would not result in marketable homes. Givianpour estimated the lots would have sold for $35,000 to $40,000 each before the rezoning, meaning that the fair market value of Sector 16 was $5.7 million on December 4, 2011. Givianpour estimated that, after the rezoning, the property was worth $200,000 on the theory that they could only sell the property to other homeowners in the neighborhood.

The jury found that there was a regulatory taking without just compensation; that before the taking, the value of the property was $3,532,849.19; and after the taking, the value of the property was $500,000. The court added prejudgment

interest of 6%, and entered a final judgment for SGV of $3,505,030.65. The City filed a notice of appeal, and the court granted a motion for stay while the appeal was pending.

## II. Standards of Review

We review our own jurisdiction to hear a case, including questions of ripeness, *sua sponte*. *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.7 (11th Cir. 1989). When a district court makes a jurisdictional ruling, we review legal conclusions *de novo* and factual determinations for clear error. *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1238 (11th Cir. 2002).

Evidentiary rulings are reviewed under an abuse of discretion standard. *Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993). A district court abuses its discretion where its decision rests upon a clearly erroneous finding of fact, an erroneous conclusion of law, or an improper application of law to fact. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016). "However, even a clearly erroneous evidentiary ruling will be affirmed if harmless. An error is harmless unless it affects the substantial rights of the parties." *Id*. (internal citation omitted).

## III. Discussion

The City makes five arguments on appeal. First, that the just compensation claim was not ripe. Second, that the evidence tending to show the City acted in an

9

arbitrary and capricious manner was irrelevant and prejudicial. Third, that evidence concerning the value of SGV's property was irrelevant. Fourth, Cox's testimony about how much he would have paid for hypothetical R-4 lots was irrelevant and prejudicial. Finally, that the City's evidence regarding how SGV lost much of its property after the rezoning due to foreclosure was relevant and thus the district court erred in precluding it.

## A. Ripeness

Ripeness, like standing, "present[s] the threshold jurisdictional question of whether a court may consider the merits of a dispute." *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006). "In order for [a just compensation] claim to be ripe for adjudication . . . [t]he landowner must obtain a final decision regarding the application of the zoning ordinance or regulation to his or her property[.]" *Eide v. Sarasota Cty.*, 908 F.2d 716, 720–21 (11th Cir. 1990).[9]

The City argues that the case was not ripe for trial because SGV never received any determination from the City as to the application of the zoning on the

---

[9] We note that in addition to the finality requirement, *Eide* also set forth a second requirement for a just compensation claim to be ripe for adjudication—that the landowner must "utilize state procedures which provide for obtaining just compensation." 908 F.2d at 720–21. However, the Supreme Court overruled the state-litigation requirement in *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167 (2019). Accordingly, a landowner is no longer required to pursue state procedures to secure just compensation under state law before bringing a Fifth Amendment just compensation claim in federal court. *Id.* Thus, the fact that SGV did not pursue just compensation in state court does not affect our ripeness determination in this case. *Id.*

property.  In other words, the City argues that SGV has not satisfied the final decision requirement.  *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162 (2019) ("[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.").

The City centers its argument on our *Eide* decision, particularly one line from the opinion: "The final decision requirement includes a requirement that the property owner seek variances from the applicable regulations."  908 F.2d at 721 (citing *Williamson Cty.*, 473 U.S. at 188).  Thus, the City argues our case law requires SGV to have sought a variance from the zoning ordinance before pursuing the case in court.

The City's argument is unpersuasive for multiple reasons.  First, our binding precedent holds that a zoning ordinance can itself be a final decision on the merits. *See A.A. Profiles, Inc. v. City of Ft. Lauderdale*, 850 F.2d 1483, 1487 (11th Cir. 1988) (hereinafter *A.A. Profiles I*) ("Because the rezoning ordinance was a final decision by the City with respect to appellant's property and because the Board does not review the City's zoning decisions, we now address the merits of the

11

takings claim.").[10]  Second, the factual scenario underlying this case is significantly different than that in *Eide* or *Williamson County*.  *See Eide*, 908 F.2d at 727 ("Decisions on ripeness issues are fact-sensitive.").

The final decision requirement is a well-established component of federal ripeness law.  In *Williamson County*, a county changed its zoning ordinances to "require that calculations of allowable density exclude 10% of the total acreage to account for roads and utilities."  473 U.S. at 178.  This new density calculation interfered with a subdivision already in the process of being built by the plaintiff.  *Id*. at 179–80.  In this posture, the Supreme Court found that "[i]t appears that variances could have been granted to resolve at least five of the Commission's eight objections to the plat" and that the plaintiff should have applied for those variances.  *Id*. at 187–88.  In *Eide*, similarly, a county adopted a "comprehensive plan . . . to map out the future development of land in the County."  908 F.2d at 719.[11]  The plaintiff in *Eide* challenged the general sector plan as applied to his property without requesting that his property be rezoned.  *See id*. at 719–20.  We noted that the "[m]ere adoption of a sector plan does *not* change the zoning of any

---

[10] Though we do not believe *A.A. Profiles I* conflicts with *Eide*, to the extent the City argues that it does, we are required to follow *A.A. Profiles I*, as it is the older precedent.  *See Walker v. Mortham*, 158 F.3d 1177, 1188–89 (11th Cir. 1998).

[11] *Eide* dealt with a challenge to the regulation itself, the "arbitrary and capricious" type of challenge noted above.  *See* 908 F.2d at 722.  Because "different standards of ripeness" govern different types of challenges, *id*., *Eide* is not dispositive for this just compensation claim, but we find the factual situation instructive.

of the properties involved," *id.* at 719 (emphasis in original), and that "[i]n order to challenge the County's *application* of the sector plan to his property, Eide must first demonstrate that the sector plan has been *applied* to his property." *Id.* at 724 (emphasis in original).

In both *Eide* and *Williamson County*, then, there was a general plan for a large portion of the county that only coincidentally ended up affecting a discrete portion of property owned by each plaintiff. That situation implicated the final decision concern noted in *A.A. Profiles I*:

> On numerous occasions the Supreme Court has noted that a takings claim based on the application of a governmental regulation "is not ripe [for adjudication] until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." This finality requirement is necessary so that the court can evaluate the "economic impact" and the extent of interference with "reasonable investment-backed expectations" by the challenged state action.

*A.A. Profiles I*, 850 F.2d at 1486 (alteration in original) (internal citations omitted) (quoting *Williamson Cty.*, 473 U.S. at 186, 191). The zoning ordinances in *Williamson County* and *Eide* were not "final decisions" in the sense that the county had not decided how it was going to apply a broad, county-wide zoning ordinance or regulation to a specific piece of property owned by the plaintiff.

The facts of this case are quite different. The City engaged in discussions with SGV for years about what SGV was going to do with Sector 16. Then the recession hit, and the City began to hear complaints from neighbors adjacent to

13

Sector 16 who were worried that SGV would lose the property through foreclosure and another builder would ruin the aesthetic value of the neighborhood. In response, the City passed a specific ordinance that targeted precisely and only Sector 16. Moreover, it passed the ordinance over objection by SGV. In this case, there was no ambiguity as to how a general plan would be applied to a specific project—the zoning ordinance itself was the City's final decision on the matter. *See A.A. Profiles I*, 850 F.2d at 1487. This factual distinction between a targeted zoning ordinance where the plaintiff contested the application to his or her land, and a general ordinance where a plaintiff has not asked the city to rezone his or her property, harmonizes the *A.A. Profiles I* and *Eide* decisions. *See Strickland v. Alderman*, 74 F.3d 260, 266 (11th Cir. 1996) ("Decisions on ripeness are fact sensitive." (quoting *Eide*, 908 F.2d at 727)); *see also Reahard v. Lee Cty.*, 30 F.3d 1412, 1415 (11th Cir. 1994) ("In *most cases*, no 'final decision' has been reached until an aggrieved landowner has applied for at least one variance to a contested zoning ordinance." (emphasis added) (citing *Williamson*, 473 U.S. at 186)).

The other case on which the City relies, *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340 (1986), is inapposite to the facts here. In that case, the plaintiff filed a just compensation claim against a county planning commission immediately after the commission rejected plaintiff's proposed subdivision plan. *See id*. at 342–43. The *MacDonald* court held that the plaintiff, by "submit[ting]

14

one subdivision proposal and . . . receiv[ing] the Board's response thereto," had not received a "final, definitive position regarding how [the commission] will apply the regulations at issue to the particular land in question." *Id*. at 351 (quoting *Williamson Cty.*, 473 U.S. at 191). Unlike the present case, then, the county had not clearly spoken as to how the zoning ordinance would be applied to the subject property because the plaintiff had not sought such an answer. Here, we have a different issue: whether the City's zoning ordinance for Sector 16 affected the economic value of that property so greatly as to constitute a taking. *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1576 (11th Cir. 1989) ("As there is no uncertainty regarding the level of development that would be permitted, *MacDonald*'s reapplication requirement serves no purpose here." (citing *MacDonald*, 477 U.S. at 352 n.8)).

In summary, the zoning ordinance that specifically targeted the plaintiff's property—over SGV's objection and without means of relief under Alabama

15

law[12]—was a final decision on the matter such that the case is ripe.[13]  *See*

*Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001) ("While a landowner must

give a land-use authority an opportunity to exercise its discretion, once . . . the

permissible uses of the property are known to a reasonable degree of certainty, a

takings claim is likely to have ripened.").

---

[12] Even assuming *arguendo* the City's decision was not final, we still hold that this case is ripe because of the futility exception: "An exception to the final decision requirement exists where it would be futile for the plaintiff to pursue a final decision." *Strickland*, 74 F.3d at 265. In *Greenbriar*, we analyzed a takings claim where a zoning ordinance was construed as a "final zoning decision[]" under the finality doctrine.  881 F.2d at 1573.  *Greenbriar* involved the exact same city as this case (Alabaster, Alabama) and based its decision, in part, on that city's governmental structure. *See id*. at 1572.  We held the plaintiff "did not fail to secure any variances which might be available" because "there are no variances available under the applicable local law which could change the zoning classification of the property." *Id.* at 1575. We also noted that the structure of Alabama law prohibited the local zoning board from modifying an ordinance to rezone a tract of land. *Id*. at 1575 n.9; *see also* Ala. Code § 11-52-80(d)(3) (1975).  Thus, we concluded, Alabaster's zoning decision was necessarily final. *See Greenbriar*, 881 F.2d at 1575.  As SGV argues, Alabama law still does not have a process through which variances can change zoning ordinances.  Alabama law empowers the board of adjustment to "authorize upon appeal in specific cases such variance from the terms of the ordinance as will not be contrary to the public interest."  Ala. Code § 11-52-80(d)(3).  However, those variances must "not be contrary to the public interest" and must ensure "the spirit of the ordinance shall be observed." *Id*.  These criteria show that the variance cannot *undo* an ordinance; given that the ordinance here was for only Sector 16, a variance for Sector 16 would plainly not be within "the spirit of the ordinance."  Therefore, on the record before us, the case is ripe for adjudication under the futility doctrine.

[13] The City also argues that the case is not ripe because SGV failed to exhaust its administrative remedies.  But in non-prisoner civil cases, such as here, "exhaustion of state administrative remedies [is] not [] required as a prerequisite to bringing an action pursuant to § 1983." *Patsy v. Bd. of Regents of State of Fla*., 457 U.S. 496, 516 (1982); *Knick*, 139 S. Ct. at 2179 (finding that States are "[not] free to require plaintiffs to exhaust administrative remedies before bringing constitutional claims"); *see also Greenbriar*, 881 F.2d at 1574 n.8 ("Thus, exhaustion of administrative remedies is not required either for a takings claim or for a substantive due process claim.").  The City's claim that the matter was not ripe due to SGV's failure to exhaust administrative remedies fails as a matter of law.

**B.  Evidence Regarding the City's Motive**

The City next argues that, by permitting evidence regarding the City's reasoning for passing the zoning ordinance (hereinafter referred to as the City's "motivation"), the court allowed an "arbitrary and capricious" challenge to the ordinance, which is proper only under a substantive-due-process claim, not aregulatory-taking-without-just-compensation claim.  Essentially, the City invites us to recognize a categorical rule which would exclude all evidence regarding *why* a zoning ordinance was passed in just compensation trials.  This we cannot do. While we agree with the City that some of the evidence presented below went beyond what was relevant to the just compensation claim, we disagree that *all* the evidence regarding why and how the City passed the zoning ordinance was irrelevant.  Moreover, given the record before us, we find any error in the admission of irrelevant evidence harmless.

*1.  Relevance of the Evidence*

Evidence is relevant if it has any tendency to make any fact which is of consequence in determining the action more or less probable than it would be without the evidence.  Fed. R. Evid. 401.  As we have noted before, "[t]he standard for what constitutes relevant evidence is a low one." *United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002).  "Relevant evidence" in a takings case includes anything related to the value of the property taken. *United States v. Certain Land*

*at Irving Place & 16th St.*, 415 F.2d 265, 271 (2d Cir.), amended sub nom. *United States v. Certain Land, Irving Place & 16th St*., 420 F.2d 370 (2d Cir. 1969). Relevant evidence can also include the "circumstances under which a plaintiff's [] property was confiscated" that underlie the takings claim. *Paalan v. United States*, 58 Fed. Cl. 99, 102 (2003).

The City's argument that delving into the reasons for the zoning ordinances was an irrelevant inquiry is based primarily on *Eide*, wherein this court recognized "four types of challenges which a plaintiff may bring" to a regulation affecting his or her property under the Fifth Amendment. *Eide*, 908 F.2d at 720. "We refer to these claims as just compensation, due process takings, arbitrary and capricious due process, and equal protection claims." *Id*. For an arbitrary and capricious claim, "a plaintiff may argue that the regulation is arbitrary and capricious, does not bear a substantial relation to the public health, safety, morals, or general welfare, and is therefore an invalid exercise of the police power." *Id.* at 721.

While *Eide* certainly established different types of takings claims, and acknowledged that "[t]his court has itself confused due process takings and arbitrary and capricious due process claims," *Eide* stated that the danger of this "confusion" is that it "may result in incorrect analyses of cases because *different standards of ripeness* are required for each" type of claim. *Id.* at 722–23 (emphasis added). *Eide*'s four categories, therefore, are primarily concerned with

18

factual scenarios of ripeness; we did not hold that different types of claims require completely separate types of evidence. Indeed, it is inevitable that there is some crossover in evidence between the different categories of takings claims. For example, in *A.A. Profiles I*, we addressed a just compensation claim by analogizing to a case dealing with an arbitrary and capricious claim. 850 F.2d at 1488 (quoting *Wheeler v. City of Pleasant Grove* (*Wheeler I*), 664 F.2d 99, 100 (5th Cir. Unit B Dec. 1981)).

Thus, these cases demonstrate that the line between evidence relevant to show a just compensation claim and evidence relevant to show an arbitrary and capricious claim will not always be cleanly divisible. This overlap is especially true in jury trials, where the need for contextual evidence sometimes requires the court to admit evidence regarding the process of passing the regulation. *See, e.g.*, *Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012) ("Even where evidence is not directly related to a disputed fact, it may be relevant when it provides background information."); *Fisher v. Procter & Gamble Mfg. Co.*, 613 F.2d 527, 540–41 (5th Cir. 1980) (upholding judge's decision to allow in evidence of discrimination not directly relevant to plaintiff's employment discrimination claim because "[t]horough and coherent consideration of the plaintiff's claims would necessarily require the recognition of various factors which carry no independent legal consequences").

19

*2. Specific Motive Evidence is Irrelevant Pursuant to the Penn Central Factors*

Our review of the record demonstrates that some of the motivation evidence admitted by the district court indubitably went beyond providing mere context. The district court admitted evidence of the City's motivation based on language from our precedent in *A.A. Profiles I*: "For there to be a taking in this case the City's action must have failed to substantially advance a legitimate state interest. A government regulation will constitute a taking if it is 'not reasonably necessary to the effectuation of a substantial public purpose . . .'" 850 F.2d at 1487 (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 127 (1978)). The *A.A. Profiles I* decision was based on *Penn Central*, the landmark Supreme Court case that set out three factors factfinders should consider when determining whether a zoning ordinance constitutes a taking: "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action." *Penn Cent.*, 438 U.S. at 124. The district court thus found that the evidence was relevant under one of the *Penn Central* factors.[14]

---

[14] We assume for purposes of this analysis that the motivation of the City was understood to fall under the "character of the government action" factor, as SGV urges on appeal. But we note the district court did not explicitly state this theory in its ruling from the bench.

20

Based on our precedent, the district court had additional reasons to classify the evidence as pertaining to the *Penn Central* factors. We previously defined the "character of the government action" to include the "nature of the state's interest" in the regulation. *See Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427, 1433 (11th Cir. 1998) ("But the nature of the state's interest is critical in determining whether a taking has occurred. When important public interests are served, a taking is less likely to have occurred."); *see also id.* (finding that proper analysis of a takings claim includes a "necessary study of competing interests"); *A.A. Profiles, Inc. I*, 850 F.2d at 1488 (considering in part the alternatives to re-zoning available to the city while analyzing whether its action constituted a taking). However permissive our rule on what constitutes the "character of the government's action" has been, we now must recognize that the precedent on which the district court relied has been abrogated.[15]

---

[15] Our precedent on this issue seemed backed by Supreme Court precedent at the time it was issued. In *Connolly v. Pension Benefit Guaranty Corporation*, the Court analyzed as the "nature of the government action" the fact that the regulation "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation." 475 U.S. 211, 225 (1986). And in *Palazzolo*, the Supreme Court seemed to indicate that the *Penn Central* factors themselves seem to require at least examination of the purpose of the regulation: "These inquiries [into the *Penn Central* factors] are informed by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Palazzolo*, 533 U.S. at 617–18 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). These Supreme Court cases, however, predate *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005), the case which abrogates our prior conclusions on what evidence is considered relevant to the "character of the government action."

21

In 2005, the Supreme Court addressed whether the phrase "substantially advances a legitimate government interest" was "valid[] as a freestanding takings test." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005). The Court found it was not: "We conclude that this formula prescribes an inquiry in the nature of a due process, not a takings, test, and that it has no proper place in our takings jurisprudence." *Id*. The *Lingle* court explicitly rejected the argument that the *Penn Central* factor of the "character of government action" addressed the purpose of the regulation:

> In addition, the "character of the governmental action"—for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good"—may be relevant in discerning whether a taking has occurred. . . [E]ach of these [*Penn Central* factors] focuses directly upon the severity of the burden that government imposes upon private property rights.

*Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124). In explaining why a takings claim should focus exclusively on the severity of the government intrusion and not the purpose of that intrusion, the Court stated:

> an inquiry [into the purpose of regulation] is logically prior to and distinct from the question [of] whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property "for public use." It does not bar government from interfering with property rights, but rather requires compensation "in the event of otherwise proper interference amounting to a taking." Conversely, if a government action is found to be impermissible—for instance because

22

it fails to meet the "public use" requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action.

*Lingle*, 544 U.S. at 542–43 (emphases removed) (quoting *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty., Cal.*, 482 U.S. 304, 315 (1987)). *Lingle*, then, abrogates our case law which held that for a taking to have occurred, the fact finder must examine whether the city's action was "reasonably necessary to the effectuation of a substantial public purpose." *A.A. Profiles I*, 850 F.2d at 1487 (quoting *Penn Central*, 438 U.S. at 127). Instead, for just compensation claims, the "character of the government action" is another way to examine the severity of the government interference with property rights. *Lingle*, 544 U.S. at 539.[16] *Lingle* changed the type of inquiry permitted in a just compensation claim, and abrogated our earlier precedent permitting an inquiry into the rationale behind the regulation. *See Rose Acre Farms, Inc. v. United States*,

---

[16] We are not the first circuit to conclude that *Lingle* changes the type of claim falling under the just compensation portion of the takings clause:

> In concluding the "substantially advances" theory was not appropriate under the Takings Clause, the Supreme Court explained that the Takings Clause merely requires compensation for an otherwise valid governmental interference with private property rights. It does not, in and of itself, provide a cause of action for allegations that the interference with property rights is arbitrary or irrational, a theory that instead resembles a due process claim.

*Alto Eldorado P'ship v. Cty. of Santa Fe*, 634 F.3d 1170, 1175 (10th Cir. 2011) (citing *Lingle*, 544 U.S. at 543); *see also Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1277 (Fed. Cir. 2009) ("[*Lingle*]'s language itself signals the change in the law."); *Spoklie v. Montana*, 411 F.3d 1051, 1057 (9th Cir. 2005) (dismissing a ballot initiative takings challenge as using the abrogated "substantially advances a legitimate public purpose" test).

559 F.3d 1260, 1278 (Fed. Cir. 2009) ("Thus, we can confidently say that, under *Lingle*, the regulatory takings paradigm has changed. We can no longer ask whether the means chosen by government advance the ends or whether the regulation chosen is effective in curing the alleged ill. All those concerns, albeit relevant concerns in many cases dealing with governmental regulations, are now confined to a substantive due process inquiry.").

The district court's reliance on our abrogated precedent is perhaps understandable.[17] Until today, we had not yet recognized that the Supreme Court overruled this aspect of our just compensation case law. And because we find below that any error the district court made in admitting evidence under the *Penn Central* factors regarding motivation which was not necessary for context was

---

[17] Neither, however, should our holding today come as a shock. Some of our other pre-*Lingle* precedent seemed to anticipate the Supreme Court's distinction between due process claims that challenge the public necessity of a regulation and a just compensation claim under the Takings Clause:

> Technically, the fifth amendment's just compensation clause is not applicable where there has been no "public use." Such may be the case where, as here, the land use regulation that effected the taking was not enacted in furtherance of the public health, safety, morals, or general welfare. The affected landowner may nevertheless have a damage cause of action under section 1983 since the taking may violate his fourteenth amendment rights to due process. Regardless of which constitutional provision a taking falls under, the measure of damages to which the aggrieved landowner is entitled is the same.

*Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 270 n.3 (11th Cir. 1987) (hereinafter *Wheeler III*) (citation omitted); *see also A.A. Profiles II*, 253 F.3d at 583 (recognizing that if a government's "regulation is not enacted in furtherance of the public health, safety, morals, or general welfare," then there is "no Fifth Amendment taking").

24

harmless, the admission of evidence regarding the City's motivation was not reversible error.

### 3. Harmless Error

Erroneous evidentiary rulings in a just compensation case, as in all civil cases, are subject to harmless error review. *See* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

In the just compensation context, an evidentiary error is harmless if there is no demonstrable effect on the ultimate verdict or other prejudice to the appellant. *See United States v. 158.24 Acres of Land*, 696 F.2d 559, 564 (8th Cir. 1982) ("We turn then to consideration of the prejudice, if any, resulting from the offending testimony, for we recognize that admission of evidence to some extent is discretionary, and we are mindful of the harmless error rule as applied to jury cases. Moreover, we commonly sustain [just compensation] awards that are 'within the scope of the evidence.'" (quoting *United States v. 9.20 Acres of Land*, 638 F.2d 1123, 1126 (8th Cir. 1981) (internal citations omitted))); *United States v.*

25

*191.07 Acres of Land*, 482 F.3d 1132, 1137 (9th Cir. 2007) (holding error harmless when appellant failed to identify the particular harm in a just compensation case).[18]

We find any error here harmless because substantial, permissible evidence produced at trial supports the jury's verdict.  It was undisputed that developing Sector 16 into R-2 was not economically feasible.  It was undisputed also that the rezoning occurred after SGV spent a significant sum of money preparing the property for R-4 homes.  The only evidence regarding the value of the property before and after the zoning was brought by SGV—in fact, the City did not call any witnesses.  The evidence clearly supported a finding that a taking occurred. Further, the jury awarded an amount that was about $2.5 million dollars less than SGV's estimate—the only estimate provided to the jury.  City has not demonstrated any prejudice resulting from the erroneous admission of testimony regarding the City's motive.[19]

---

[18] Because we have not previously ruled on a just compensation case where the evidence relating to a decision maker's motivation in passing an ordinance was erroneously admitted based on abrogated precedent, we necessarily are guided in this analysis by our sister circuits.

[19] To the extent that the City bases its argument for harmful error on SGV's closing argument, the record demonstrates that the jury was specifically instructed that "anything the lawyers have said in their opening statements, their questions, their objections, the closing arguments that they are about to make, these things are not evidence and counsel's statements are not binding on you."  We also note that the amount of argument dedicated to the City's motivation, and the amount of evidence that came in over the course of the four-day trial that was improper, was *de minimis*.  *See Bailey v. S. Pac. Transp. Co.*, 613 F.2d 1385, 1389 (5th Cir. 1980) ("Even assuming the trial court erred in not sustaining defendant's objection, the doctrine of harmless error surely encompasses one statement during the course of a two day trial . . . .").  Finally, portions of SGV's argument could be construed as going to the "severity of the burden

## C. Evidence Regarding the Value of Sector 16

The City next argues that the district court committed reversible error by admitting "hypothetical values" of Sector 16. The City objects to SGV's valuation of the property as though the entirety of Sector 16 was previously zoned R-4 when in truth a small portion of it was actually zoned R-2 or R-7.[20] The City also objects to SGV's use of the "lot method" of valuation on "raw land," suggesting that it results in valuations that are too speculative. The City has waived these arguments.

The City raises its argument regarding the use of R-4 lot values for lots zoned R-2 and R-7 for the first time on appeal. Although the City filed a motion *in limine* to preclude certain valuation evidence, and the City objected to opposing counsel speaking about the value of the lots in opening arguments, those two objections were not sufficient to preserve this issue because the substance of the City's objection was quite different from what it now argues. At trial, the City objected that a contract from 2005 was being used as a basis to calculate lots in 2011. In the motion *in limine*, the City argued that the disputed 2005 contract could not serve as a basis for the value of the property because the lots did not

that [the] government impose[d]" on SGV, which is consistent with the *Penn Central* factors. *Lingle*, 544 U.S. at 539.

[20] To be clear, the jury did not specify how it reached the amount of compensation it awarded. The number it awarded was lower than the figure SGV calculated.

"legally exist," as the preliminary plat was never approved, and did not "physically

exist," because the relevant infrastructure was not in place.  These objections went

to the attenuation of the evidence over time and the lack of work SGV had done on

the property.  On appeal, the City argues that not all the lots were zoned R-4, so it

was error to allow evidence regarding the value of R-4 lots to serve as the

valuation basis for all of Section 16.  The City points to no place in the record

below where it made that particular argument, and our review of the record does

not reveal such an objection.  *See* Fed. R. Evid. 103 (to preserve an objection, the

party must "state[] the specific ground" for the objection).

As to the City's second ground, that the "lot method" of valuation is

inappropriate for raw land, the timing of that objection was insufficient to preserve

the issue.  The City objected on that ground only in a motion *in limine*.  But "[t]he

overruling of a motion *in limine* is not reversible error; only a proper objection at

trial can preserve error for appellate review."  *Hendrix v. Raybestos-Manhattan*,

Inc., 776 F.2d 1492, 1504 (11th Cir. 1985) (quoting *Collins v. Wayne Corp*., 621

F.2d 777, 784 (5th Cir. 1980)).  We therefore decline to consider this waived

argument on appeal.[21]

---

[21] We note that, even if either argument were not waived, the City would have likely been unsuccessful, as our abuse of discretion review is highly deferential.  *See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) (noting that, under an abuse of discretion standard, an appellate court is not to substitute its judgment for that of the district court's so long as there is a basis for the district court's decision).

**D. Evidence from Cox about Desire to Purchase Lots**

The City also argues that it was error for the district court to allow Cox to testify that he would have been interested in making an offer for SGV's R-4 lots, but not R-2 lots, if they were back on the market in 2011. We find no error here. That evidence was relevant to SGV's just compensation claim—that they lost property through the rezoning from R-4 to R-2 because (1) there was not a market for the type of R-2 they would have to build to comply with the zoning ordinances, and (2) R-4 zoning was more "coveted" by prospective builders. Cox's testimony was also relevant to show there was a potential market for the lots designated R-4 in 2011 before the rezoning occurred. As another circuit has noted,

> [t]he landowner is . . . entitled to have the fact finder take into consideration all factors of value that would affect the market value of the property. From the landowner's standpoint, a factor of value would be anything that would induce a reasonable seller to demand more for the property and would induce a reasonable buyer to pay more on account of the existence of the value factor.

*United States v. 91.90 Acres of Land*, 586 F.2d 79, 87 (8th Cir. 1978). A favorable zoning designation, and interest from a potential buyer, are both such factors. Finally,

> [i]n determining what a hypothetical willing buyer would give for property, courts often look to actual, comparable sales on the open market between other willing buyers and sellers. "Generally, the more comparable a sale is, the more probative it will be of the fair market value of the condemned property." "Sound and just trial practice is to admit as many of the most comparable sales available as

29

is necessary to fairly permit each side to present its argument of fair market value for the jury's consideration."

*480.00 Acres of Land*, 557 F.3d at 1307 (quoting *United States v. 320 Acres*, 605 F.2d 762, 781 n.23, 798 (5th Cir. 1979)).  Thus, the court was committing "sound and just trial practice" in admitting evidence of a sale, or at least *interest* in a sale, that was "most comparable" to the situation at hand, since it was for the disputed lots themselves.  *See 320.0 Acres of Land*, 605 F.2d at 798–99 (defining "comparability" as a combination of "three variables: characteristics of the properties, their geographic proximity to one another, and the time differential."); *United States v. Deist*, 442 F.2d 1325, 1327 (9th Cir. 1971) ("Whether or not a sale constitutes a comparable sale so as to constitute evidence of value is within the sound discretion of the trial court."  (quoting *United States v. Eden Mem'l Park Ass'n*, 350 F.2d 933, 935 (9th Cir. 1965))).  The admission of Cox's testimony was not an abuse of discretion.

## E.  Precluding Evidence of Post-Ordinance Foreclosures

Finally, the City argues that it was error to preclude evidence that SGV was about to lose the property to banks in foreclosure before the rezoning.  The City admits, however, that the foreclosures occurred after the rezoning.  The exclusion of the evidence was not an abuse of discretion because it was not relevant to SGV's just compensation claim.  *See A.A. Profiles, Inc. v. City of Fort Lauderdale*, 253 F.3d 576, 585 (11th Cir. 2001) (hereinafter *A.A. Profiles II*) (holding that it

30

was an abuse of discretion to admit testimony regarding the company's financial ability to develop the property after the taking because "the relevant inquiry is not whether [the property owner] would have been successful in proceeding with its business, but to what extent the City's actions diminished the property's market value").[22]

## IV. Conclusion

This case demonstrates the particularity with which jurisdictional questions such as ripeness turn on the specific facts of the case. We find that the City took a final position on how the Sector 16 could be used, and therefore the case is ripe for adjudication. Although it may have been error for the district court to allow some evidence of the City's motivation beyond that which was necessary to provide context, we find that the error was harmless. Finally, we find that the district court did not abuse its discretion regarding the other evidentiary objections.

**AFFIRMED.**

---

[22] The City argues that *A.A. Profiles II* is distinguishable from this case because the property here was not being developed. Whether the property was in the midst of active development does not affect the relevancy of testimony regarding SGV's financial status as it pertains to this property's value. And further, the record contradicts the City's assertion. SGV had already paid $2.6 million dollars to have the property graded. It is true that there was a hiatus in operations due to the recession, but the owner of SGV testified that they were beginning to explore the market again in 2011. In fact, SGV went through the process of getting an environmental building permit just days before the regulation in this case was promulgated.