**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 21-13999

————————————————

LIONEL ALFORD,
co-Trustee of the Lionel D. Alford, Jr., and Tammy Nix Alford Revocable Trust,
TAMMY ALFORD,
co-Trustee of the Lionel D. Alford, Jr., and Tammy Nix Alford Revocable Trust,
DOUGLAS B. BUSH,
SHELLY L. BUSH,
KI FLORIDA PROPERTIES, LLC, et al.,

*Plaintiffs-Appellants*,

*versus*

WALTON COUNTY,
Political Subdivision of the State of Florida,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:20-cv-05358-RH-HTC

_____

Before LAGOA, BRASHER, and ED CARNES, Circuit Judges.

LAGOA, Circuit Judge:

The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Here, we consider whether a Walton County ordinance that proscribed all access to privately-owned beaches constitutes a "taking" under the Fifth Amendment. We hold that it does.

Despite the County's significant infringement on property rights, the district court granted summary judgment in favor of Walton County, noting that the ordinance was enacted during the COVID-19 pandemic. But there is no COVID exception to the Takings Clause. Instead, the government must respect constitutional rights during public emergencies, lest the tools of our security become the means of our undoing. "The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom. As John Adams tersely put it, '[p]roperty must be secured, or liberty cannot exist.'" *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) (quoting *Discourses on Davila, in 6 Works of John Adams* 280 (C. Adams ed. 1851)).

Accordingly, after careful review, and with the benefit of oral argument, we affirm the district court's dismissal of the

Landowners' prospective claims, but we reverse the district court's judgment on the Landowners' Takings Clause claim.  Because we hold that the County effectuated a "taking" of the Landowners' property, we need not address the Landowners' claims under the Fourth and Fourteenth Amendments.[1]  On remand, the district court shall consider the amount of "just compensation" that the Landowners are entitled to.  U.S. Const. amend. V.

## I.    BACKGROUND

Americans who lived through the COVID-19 pandemic will never forget March 2020—the month that a novel virus from Wuhan, China became a global pandemic.  On March 9, 2020, Florida's Governor declared a state of emergency.  Eight days later, the Governor issued Executive Order 20-68, which, among other things, "direct[ed] parties accessing public beaches" to limit their "gatherings to no more than 10 persons," to "distance themselves from other parties by 6 feet," and to abide by "beach closures at the discretion of local authorities."

Two days after Executive Order 20-68, the Walton County Board of Commissioners ("Board") adopted Ordinance 2020-08.  The Ordinance closed all public beaches in Walton County, Florida, and it made accessing public beaches a criminal offense.  But Ordinance 2020-08 did not affect private beaches.  After the Board

---

[1] At oral argument, the Landowners' counsel stated that the Landowners' damages are the same no matter what claim they prevail on.  So, because we hold that Walton County violated the Takings Clause, we need not address the Fourth and Fourteenth Amendment claims.

issued the Ordinance, the County Attorney publicly stated that the Board did not have the authority "to keep beachfront property owners from their private property."

On April 1, 2020, the Governor issued two more executive orders. The first, Executive Order 20-91, provided that "all persons in Florida shall limit their movements and personal interactions outside of their home to only those necessary to obtain or provide essential services or conduct essential activities." The Order provided that "recreational activities (consistent with social distancing guidelines) such as walking, biking, hiking, fishing, hunting, running, or swimming" qualified as essential. The second order, 20-92, stated that Executive Order 20-91 "shall supersede any conflicting official action or order issued by local officials in response to COVID-19."[2]

On April 2, 2020, the Board issued Ordinance 2020-09, which provided, in relevant part:

> 1. All beaches within Walton County, Florida, are temporarily CLOSED.

---

[2] Executive Order 20-92 broadened the preemptive effect of Executive Order 20-91. Section 4 of Executive Order 20-91 originally provided that the order "supersede[d] any conflicting official action or order issued by local officials in response to COVID-19 . . . only to the extent that such action or order allows essential services or essential activities prohibited by this Executive Order." Executive Order 20-92 provided that section 4 of Executive Order 20-91 "should read, as follows: [Executive Order 20-91] shall supersede any conflicting official action or order issued by local officials in response to COVID-19."

2.  It shall be unlawful for any person to enter upon or remain on the beaches within Walton County.

. . .

4.  A violation of this Ordinance shall constitute a criminal offense and shall be punishable as provided in Section 252.50, Florida Statutes.

. . .

6.  This Ordinance shall become effective immediately and shall be in effect until April 30, 2020, unless extended by the Walton County Board of County Commissioners.

In other words, Ordinance 2020-09 closed *all* beaches in Walton County—public and private—and made it a criminal offense for private beach owners (or anyone else) to use or access their beach property.[3] The ordinance also contained a sunset provision providing that the ordinance would expire on April 30, 2020, unless extended by the Board. Meanwhile, grocery stores, hardware stores, pharmacies, and public parks in Walton County remained open. As such, even though landowners could not walk or swim on their private property, Walton County conceded at oral argument that the landowners could walk, swim, and engage in other recreational activities in public places.

---

[3] Ordinance 2020-09 defined "beach" by reference to the Walton County Code, which defines the term as "the soft sandy portion of land lying seaward of the seawall or the line of permanent dune vegetation."

Four days after Ordinance 2020-09 became effective, several landowners—Lionel and Tammy Alford, Douglas and Shelly Bush, K1 Florida Properties, LLC, Camping on the Gulf Land, LLC, Sandy Shores Property Owners Association, Inc., Todd Harlicka, Christopher Corrado, Edward and Joy McMillian, JE Coastal Properties, LLC, and Eric and Deborah Wilhelm (the "Landowners")[4]—sued Walton County in federal court. Ordinance 2020-09 affected the various Landowners differently. For example, Harlicka, Corrado, and the Rudds could not access any part of their property, because their entire parcels qualified as part of the "beach" under the Ordinance's definition. Comparatively, others owned parcels that were partly "beach" and partly adjacent to the beach. Even so, Ordinance 2020-09 forbade those Landowners from entering and remaining on significant portions of their private property.

Soon after filing suit, several Landowners moved to preliminarily enjoin the enforcement of Ordinance 2020-09. The district court denied the motion, reasoning, "We are in the midst of a

_____

[4] On July 7, 2020, Toscana 41, LLC, and Jason and Seth Rudd also joined the lawsuit as plaintiffs. They are included in this Court's reference to the "Landowners."

But several of the other plaintiffs are no longer a part of this lawsuit. John Dodero, Esther Dodero, David Bradford, and St. Johns Florida Properties, LLC, voluntarily dismissed their claims against the County. Michael Huckabee, Janet Huckabee, and Parker Petit were plaintiffs to the suit below, but they did not appeal.

Also, the Landowners originally named the Walton County Sheriff as a defendant, but they voluntarily dismissed their suit against the Sheriff on May 13, 2020.

national health emergency, and it seems highly likely at this stage of the case that the county has the authority to take the measures that it has in order to address that emergency."

While the case progressed in district court, Walton County vigorously enforced Ordinance 2020-09. Several witnesses testified in depositions that law enforcement "basically used" the Landowners' beaches "as a highway," crossing the properties "multiple times an hour." Officers also parked vehicles at the entrances of private beaches and remained there to deter entry.

The County also obtained compliance by confronting some Landowners on their private beaches and threatening arrest. For example, on April 3, 2020, a South Walton Fire and Safety officer confronted Todd Harlicka, his family friend, and their two children after they walked onto a private beach that Harlicka owned. The officer informed them of Ordinance 2020-09 and insisted that they leave, telling them the "sheriff would come and take action" if they refused. Shortly after, a lifeguard confronted Harlicka and radioed the Walton County Sheriff's Office. Sheriff's deputies arrived almost immediately. One of the deputies again advised Harlicka that he and the other beachgoers would be taken into custody unless they left the beach. Harlicka informed the deputy that the beach was his private property, but the deputy insisted that the Ordinance took precedence. As Harlicka and his friend turned to leave, the deputy stopped them and asked for their names, so that if the police did "catch" Harlicka and his friend on the beach "again," the police could take them "downtown."

That was not the only confrontation. For example, Eric Wilhelm's daughter and niece were forced to leave Wilhelm's private beach when Walton County law enforcement found them walking there. Likewise, Timothy Rokisky, the corporate representative for K1 Florida Properties, testified that he typically celebrated his anniversary with his wife by staying at his beachfront property in Walton County. In April 2020, Rokisky called the Walton County Sheriff's Office while he was out of town to determine whether he and his wife could access the beach if they visited. The Sheriff's Office told Rokisky that he and his wife were not allowed on the beach. So, the Rokiskys decided against traveling to Walton County.

Ordinance 2020-09 expired on April 30, 2020, as provided for by its sunset clause. The Board did not renew the Ordinance, and Walton County's private beaches have remained open since the Ordinance's expiration. Less than a week after Ordinance 2020-09 expired, the County also reopened its public beaches.

As this case progressed below at the district court, the Landowners amended their complaint twice. The second amended complaint asserts six claims against Walton County: (1) a Takings Clause claim under 42 U.S.C. § 1983; (2) a claim for declaratory and injunctive relief alleging that the Governor's Executive Orders 20-91 and 20-92 preempted Ordinance 2020-09; (3) a claim for declaratory and injunctive relief under Article I, Section 23 of the Florida Constitution; (4) a damages claim under § 1983 and the Due Process Clause of the Fourteenth Amendment; (5) a damages claim

under § 1983 for violation of the Fourth Amendment; and (6) a claim for declaratory and injunctive relief asserting that the County lacked authority under Florida law to issue Ordinance 2020-09.

In September and October of 2020, the parties cross-moved for summary judgment on all claims. The district court dismissed the Landowners' claims for prospective relief as moot and granted summary judgment in favor of Walton County on all the Landowners' claims for damages. The district court addressed its jurisdiction first and concluded that Plaintiffs' claims for prospective relief were moot. The district court explained that the County "unambiguously terminated" Ordinance 2020-09 and that "[t]he ordinance isn't coming back."

The district court then addressed the Landowners' damages claims, starting with a discussion of background "constitutional principles." Relying on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the district court claimed that the government generally has wide latitude to address public-health emergencies. Turning specifically to the Landowners' Takings Clause claim, the district court held that Ordinance 2020-09 was not a *per se* physical taking because the Ordinance imposed a "use" restriction and did not physically appropriate the Landowners' properties. The district court also held that the County had not effectuated a regulatory taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). The district court then addressed the Landowner's other claims for damages and granted summary judgment in favor of Walton County on all the remaining counts. The Landowners appealed.

## II.   STANDARD OF REVIEW

We review de novo a district court's dismissal of claims for mootness.  *See Hall v. Sec'y*, 902 F.3d 1294, 1297 (11th Cir. 2018). But we review any "factual findings underlying a mootness decision for clear error." *Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 701 (11th Cir. 2014).

"We review a district court's rulings on cross-motions for summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party on each motion." *Signor v. Safeco Ins. Co. of Illinois*, 72 F.4th 1223, 1227 (11th Cir. 2023).  Summary judgment is appropriate if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.   ANALYSIS

Plaintiffs raise two relevant claims on appeal.  First, they contend that the district court improperly dismissed as moot their claim for violations of their right to privacy under Article I, Section 23 of the Florida Constitution.  Second, they assert that Ordinance 2020-09 effected an uncompensated taking of their properties and, thus, that they are due just compensation under the Takings Clause.  We address each argument in turn.

For the forgoing reasons, we affirm the district court's dismissal of the Landowners' prospective claims, but we reverse the district court's judgment on the Landowners' Takings Clause claim. Because we hold that the County effectuated a "taking" of the Landowners' property, we need not address the Landowners'

claims under the Fourth and Fourteenth Amendments.  On remand, the district court shall consider the amount of "just compensation" that the Landowners are entitled to.  U.S. Const. amend. V.

### A. Mootness

The Landowners alleged three claims for declaratory and injunctive relief.  The district court dismissed all three claims as moot because "[t]he challenged ordinance is no longer in effect" and "isn't coming back."  On appeal, the Landowners challenge the dismissal solely as to their claim under Article I, Section 23 of the Florida Constitution.  We agree with the district court's dismissal of the Landowners' claims for declaratory and injunctive relief.

Article III limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. Art. III, § 2; *Murthy v. Missouri*, 144 S. Ct. 1972, 1985 (2024).  "The 'case or controversy' requirement is 'fundamental to the judiciary's proper role in our system of government.'"  *Murthy*, 144 S. Ct. at 1985 (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).  The mootness doctrine derives from the case-or-controversy requirement because "an action that is moot cannot be characterized as an active case or controversy."  *Hall*, 902 F.3d at 1297 (quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335 (11th Cir. 2001)).

When "a complaining party manages to secure" "all the relief" that he is suing for in litigation, "a federal court must dismiss the case as moot."  *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 240 (2024).  But to be sure, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."  *Already,*

*LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends."  *Id.*  "[A] federal court's constitutional authority cannot be so readily manipulated."  *Fikre*, 601 U.S. at 240.  Accordingly, the standard "for determining whether a case has been mooted by the defendant's voluntary conduct is stringent."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  "[S]ubsequent events" must make it "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (emphasis added) (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)).

To determine whether a defendant's voluntary cessation renders a case moot, a reviewing court should look to three factors. *See Schultz v. Alabama*, 42 F.4th 1298, 1321 (11th Cir. 2022); *Djadju v. Vega*, 32 F.4th 1102, 1109 (11th Cir. 2022).  First, we examine whether "the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate jurisdiction." *Djadju*, 32 F.4th at 1109.  Second, we ask whether "the government's decision to terminate the challenged conduct was unambiguous, i.e., permanent and complete."  *Id.*  Finally, we consider whether "the government has consistently maintained its commitment to the new policy or legislative scheme."  *Id.*  These factors are not exclusive, and no single factor is dispositive on its own.  *Id.*; *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1268 (11th Cir. 2020).

Here, all three factors weigh in favor of mootness. Ordinance 2020-09 expired over five years ago by virtue of its sunset clause. The Ordinance's natural expiration through a sunset clause suggests that the County's voluntary cessation is not simply "an attempt to manipulate jurisdiction." *Djadju*, 32 F.4th at 1109. Additionally, when the private-beach closure expired, Walton County also issued a resolution reopening its public beaches, which are not implicated by this litigation. That suggests Walton County engaged in a deliberate and unambiguous policy of reopening all its beaches (even beaches irrelevant to this litigation), and that supports a finding of mootness under the first and second factors. *Id.* Finally, Walton County has never renewed the private-beach closure since its expiration five years ago, which further supports a finding of mootness under the third factor. *Id.*

The Landowners respond that beach closures may recur in response to COVID-19 mutations. To support that argument, however, the Landowners cite non-analogous restrictions imposed by *other* jurisdictions—including an indoor mask mandate in Philadelphia and lockdowns in China. Although other jurisdictions might have imposed new restrictive measures in response to mutations of the virus, Walton County has consistently kept its public and private beaches open despite COVID-19's various mutations. The longevity of the County's open-beach policy, as well as the consistency of the new policy despite the various mutations of COVID, suggests that the County's voluntary cessation is permanent and not an attempt to evade federal review.

Accordingly, we affirm the district court's dismissal of the Landowners' claim for prospective relief under Article I, Section 23 of the Florida Constitution.

## B. The Takings Clause

Turning to the Landowners' Takings Clause claim, the district court held that Ordinance 2020-09 was neither a physical taking nor a regulatory taking. We disagree. This case involves a textbook physical taking: Walton County enacted an ordinance barring the Landowners from entering and remaining on their private property; Walton County's officers physically occupied the Landowners' property; and Walton County's officers excluded the Landowners from their own property under threat of arrest and criminal prosecution. In other words, Walton County wrested the rights to possess, use, and exclude from the Landowners, and it took those rights for itself. That triggers the Landowner's right to just compensation.

We begin our analysis with the text of the relevant constitutional provision. The Takings Clause provides, "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.[5] The term "property" in the Takings Clause "denote[s] the group of rights inhering in the citizen's relation to the physical thing." *United States v. Gen. Motors Corp.*, 323 U.S. 373, 377–78 (1945). That group of rights includes the rights to possess, to

---

[5] The Takings Clause "applies against the States through the Fourteenth Amendment." *Webb's Fabulous Pharms., Inc. v. Beckwith*, 449 U.S. 155, 160 (1980).

exclude, to use, and to dispose of property. *Id.* at 378; *Cedar Point*, 594 U.S. at 149–50; *see also Property*, Black's Law Dictionary (11th ed. 2019) (defining "property" as "the rights in a valued resource such as land, chattel, or an intangible" and identifying the rights to use, enjoy, possess, exclude, and transfer as those associated with property ownership).

Of this bundle of rights, "[t]he right to exclude is 'one of the most treasured.'" *Cedar Point*, 594 U.S. at 149 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)); *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179–180 (1979); *see also* Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 730 (1998) ("[T]he right to exclude others is more than just 'one of the most essential' constituents of property—it is the sine qua non."). For centuries, Anglo-American law has recognized that "the very idea of property entails 'that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.'" *Cedar Point*, 594 U.S. at 149–50 (quoting 2 W. Blackstone, Commentaries on the Laws of England 2 (1766)).

Next, we must consider the word "taken." U.S. Const. amend. V. The Supreme Court recognizes two kinds of Fifth Amendment takings: physical takings and regulatory takings. *Cedar Point*, 594 U.S. at 147–49; *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321–22 (2002). When the government commits a "physical taking" by "physically acquir[ing] private property for a public use," the Takings Clause imposes "a simple,

16                    Opinion of the Court                    21-13999

*per se* rule: The government must pay for what it takes." *Cedar Point*, 594 U.S. at 147–48.  Takings that meet this categorical standard are often referred to as "*per se* physical takings." *Id.* at 158.[6]

A different standard applies when the government does not physically acquire private property, but instead "imposes regulations that restrict an owner's ability to *use* his own property." *Id.* at 148 (emphasis added).  In certain circumstances, a restriction on the "use" of private property can qualify as a "regulatory taking" if the restriction—in the Supreme Court's words—"goes too far." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 528–29 (1992) (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).  In *Penn Central*, the Supreme Court clarified the "test for how far [i]s 'too far.'" *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) (discussing *Penn Central*, 438 U.S. at 124).  The test is an "'ad hoc' factual inquiry" grounded in factors such as "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.*

Neither formal acquisition of the property's title nor actual possession of the property is required for government action to constitute a physical taking.  In *United States v. Causby*, the Supreme Court held that a taking occurred when government planes at a nearby airport frequently flew directly over a poultry farm, low

---

[6] A different *per se* rule applies when a government action deprives private property owner of all economically beneficial uses of the property. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992).  But Plaintiffs do not meaningfully advance this theory, and we need not and do not address it here.

enough to blow tree leaves off their branches. *See* 328 U.S. 256, 259 (1946). The regular flights over the property resulted in bright lights shining on the property at night, disrupting sleep, as well as noise that caused the death of approximately 150 chickens. *See id.* The farm owners eventually gave up chicken farming as a result. *Id.* The Supreme Court held that the government had taken the property because it had deprived the owners of "full enjoyment of the land" by eliminating their "exclusive control of the immediate reaches of the enveloping atmosphere." *Id.* at 264. The fact that the planes did not touch the land did not matter, the Court reasoned, because their flying over the land's immediate airspace was "as much an appropriation of the use of the land as a more conventional entry upon it," such as the erection of an elevated railway over the land. *Id.* at 264–65.

And in *Cedar Point*, the Supreme Court held that a California regulation permitting union organizers to enter an agricultural employer's property for up to three hours per day, 120 days per year was a Fifth Amendment taking that required just compensation. *See* 594 U.S. at 149–152. The Court emphasized that the regulation eliminated owners' right to exclude—"a fundamental element of the property right." *Id.* at 150 (quoting 2 W. Blackstone, Commentaries on the Laws of England 2 (1766)). And the Court explained that "[g]iven the central importance to property ownership of the right to exclude," its cases have "long treated government-authorized physical invasions as takings requiring just compensation." *Id.* The Supreme Court accordingly held that the California regulation was a taking because it created "a right to physically invade the

growers' property" and thus fell into the long line of cases holding "that government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation." *Id.* at 152.

The Court in *Cedar Point* also made an important clarification. It emphasized that the Court's definition of "regulatory taking"—"use restrictions that go 'too far'"—can sometimes "mislead." *Id.* at 149. "Government action that physically appropriates property is no less a physical taking because it arises from a regulation." *Id.* So, in distinguishing a physical taking from a regulatory taking, "[t]he essential question is not . . . whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree)." *Id.* "It is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Id.*

Although this case involves a county ordinance, the Ordinance at issue effectuated a "physical appropriation" of the Landowner's property. *Id.* Thus, "a per se taking has occurred, and *Penn Central* has no place." *Id.* Ordinance 2020-09 physically appropriated the Landowners' property because it barred their physical access to the land. And to enforce the Ordinance, the County entered the Landowners' property at will for the specific purpose of excluding the Landowners. The County's officers parked their vehicles on private property to deter entry, used private property as their own highway, and forced Landowners to vacate their property

under threat of arrest. Put simply, the County "entered upon the surface of the land and t[ook] exclusive possession of it," thereby triggering the right to just compensation. *Causby*, 328 U.S. at 261.

Notwithstanding these infringements on the right to possess and the right to exclude, the district court found that Ordinance 2020-09 was a simple "use" restriction. In so ruling, the district court emphasized that the Landowners retained the ability to sell their property, that the Ordinance was temporary, that the Landowners could still use part of their property, and that the Landowners could still exclude other citizens from their private property. None of these points makes a difference. At bottom, Ordinance 2020-09 prohibited the Landowners from physically accessing their beachfront property under any circumstances. That is different from a restriction on how the Landowners could *use* property they otherwise physically possessed.

*Cedar Point* is a useful comparison. Recognizing the distinction between physical appropriations and use restrictions, the *Cedar Point* Court rejected an argument advanced by California that the regulation permitting union organizers to enter private property was a mere use restriction. 594 U.S. at 154. There, a California regulation granted union organizers a right to access private farmland "for the purpose of meeting and talking with [agricultural] employees and soliciting their support." *Id.* at 144 (quoting Cal. Code Regs., tit. 8, § 20900(e)). Under the regulation, the union organizers had a right to access the private farmland for up to three hours per day and 120 days per year. *Id.* Importantly, the regulation in

*Cedar Point* did not infringe on the rights of the farm owners to possess, to use, or to dispose of their property. *See id.* Regardless, the Court held that the regulation effectuated a physical taking because it infringed on the owners' right to exclude the union organizers. *Id.* at 149–54. In the Court's words, "[s]aying that appropriation of a three hour per day, 120 day per year right to invade the growers' premises 'does not constitute a taking of a property interest but rather . . . a mere restriction on its use, is to use words in a manner that deprives them of all their ordinary meaning.'" *Id.* at 154 (quoting *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987)).

In other words, the mere fact that the *Cedar Point* landowners retained the rights to possess, to use, and to sell their property did not undermine the fact that a physical taking occurred. *Id.* California still "physically appropriated" the landowners' property by granting the union organizers a right of entry. *Id.* Here, the physical taking at issue is even more severe than the one in *Cedar Point*. Unlike the regulation at issue in *Cedar Point*, Ordinance 2020-09 infringes on the right to exclude *and* the rights to possess and use. The Ordinance prohibited the Landowners from entering and remaining on their own property, while County officers entered and remained at will. The mere fact that the Landowners could—according to the district court—still "exclude the public" from their property is immaterial. In *Cedar Point*, it made no difference that the property owners retained the right to exclude everyone but the "union organizers." *See* 594 U.S. at 144. Likewise, it makes no difference here that the Landowners retained the authority to exclude

21-13999                Opinion of the Court                21

everyone other than County officials tasked with enforcing the Ordinance.[7]

Nor is it material that some of the Landowners could still use part of their property. "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra*, 535 U.S. at 322. In *Horne*, for example, the Department of Agriculture effectuated a physical taking by requiring raisin growers to give the government a certain percentage of their yearly crop, free of charge. *See* 576 U.S. at 354, 361. The fact that the growers were not required to turn over all their crop did not undermine the Court's conclusion that the "reserve requirement" was a "clear physical taking." *See id.* at 361. Likewise, in *Loretto*, the Supreme Court held that a New York statute requiring the installation of television cables and boxes constituted a physical taking. *See* 458 U.S. at 421, 438. In response to the

---

[7] To be sure, the Landowners do not have the right to exclude Walton County officials who enter their property "consistent with longstanding background restrictions on property rights." *Cedar Point*, 594 U.S. at 160–61. Those background restrictions include established exceptions to the Fourth Amendment and "traditional common law privileges," such as the privilege of "entry to avert an imminent public disaster." *Id.* (citing *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 538 (1967); Restatement (Second) of Torts § 196 (1964)). But these exceptions prove the rule. The government has no right to access private property absent a well-established background exception. Under Ordinance 2020-09, County officials entered and remained on private property at will.

dissent's observation that this was a relatively minimal intrusion, the *Loretto* majority held that the size of the physical intrusion was irrelevant. *See id.* at 438 n.16 ("[W]hether the installation is a taking does not depend on whether the volume of space it occupies is bigger than a breadbox."). If the installation of television cables can constitute a physical taking, then the appropriation of a beach can also constitute a physical taking. The fact that some of the Landowners retained access to some part of their parcels makes no difference.

It likewise makes no difference that the physical taking was "temporary." To be sure, the district court correctly noted that in *Loretto*, the Supreme Court suggested that "temporary limitations" on an owner's right to exclude are different from a "permanent physical occupation" of property. 458 U.S. at 435 n.12. According to *Loretto*, "temporary limitations are subject to a more complex balancing process to determine whether they are a taking" because "they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." *Id.*

Since *Loretto*, however, the Supreme Court has clarified that "a physical appropriation is a taking whether it is permanent or temporary." *Cedar Point*, 594 U.S. at 153. Most significantly, *Cedar Point* directly addressed *Loretto* and clarified that a physical appropriation need not be permanent to constitute a taking. *Id.* (quoting *Nollan*, 483 U.S. at 832); *see also Tahoe-Sierra*, 535 U.S. at 322 ("[C]ompensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even

though that use is temporary." (citing *General Motors*, 323 U.S. 373; *United States v. Petty Motor Co.*, 327 U.S. 372 (1946))). "The duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation." *Cedar Point*, 594 U.S. at 153 (citations omitted).[8] In recognizing this rule, the *Cedar Point* majority expressly rejected the dissent's argument that the regulation at issue could not "amount to a *per se* taking because it allow[ed] 'access short of 365 days a year.'" *Id.* at 152–53 (quoting 594 U.S. at 174 (Breyer, J., dissenting)). "That position," the Court explained, "is insupportable as a matter of precedent and common sense. There is no reason the law should analyze an abrogation of the right to exclude in one manner if it extends for 365 days, but in an entirely different manner if it lasts for 364." *Id.* at 153 (majority op.). The same point applies here. The temporary nature of

---

[8] *Accord Causby*, 328 U.S. at 266–68 (finding a taking by physical "invasion," and remanding to the lower court for a damages assessment based on "whether the easement taken was temporary or permanent"); *United States v. Pewee Coal Co.*, 341 U.S. 114, 115–16 (1951) (plurality opinion) (concluding that the president's temporary seizure of a coal mine was a compensable taking); *Id.* (Reed, J., concurring) ("I agree that in this case there was a 'taking' by eminent domain that requires the Government to pay just compensation to the owner of the property for its use. . . . This is a temporary taking."); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 4–6 (1949) (considering the appropriate measure of compensation for the "temporary taking of petitioner's land, plant, and equipment"); *United States v. Dickinson*, 331 U.S. 745, 751 (1947) (holding that a taking by flooding had occurred even though the owner had since "reclaimed" most of the taken land); *General Motors*, 323 U.S. at 374–75 (considering the appropriate measure of compensation for the government's temporary taking of a warehouse).

Walton County's Ordinance does not undermine the fact that the Ordinance effectuated a physical appropriation of the Landowners' property. The Landowners are therefore entitled to just compensation.

The district court also claimed that the Supreme Court's decision in *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012), suggests that temporary physical appropriations are not per se takings. But that is directly at odds with *Cedar Point*. *Cedar Point* clarified that "*Arkansas Game and Fish Commission* reflects nothing more than an application of the traditional trespass-versus-takings distinction to the unique considerations that accompany temporary flooding." *Cedar Point*, 594 U.S. at 160 (discussing *Arkansas Game & Fish Commission*, 568 U.S. at 38–39). And the County's actions here are more than a mere trespass. A trespass is an "[i]solated physical invasion[]" that is undertaken without "a granted right of access." *Id.* at 159.[9] Here, Walton County's officers entered and occupied the Landowners' property for nearly a month. *See Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 330 (1922) (opining that "[e]very successive trespass adds to the force of the evidence" for a taking). And importantly, Walton County not only *entered* private property; Walton County also *ejected* the Landowners from their property on threat of arrest and criminal prosecution. That is a taking, not a trespass.

---

[9] *See also Trespass*, Black's Law Dictionary (12th ed. 2024) (defining "trespass" as "[a]n unlawful act committed against the person or property of another; esp., wrongful entry on another's real property").

21-13999                 Opinion of the Court                        25

Finally, a word about the district court's invocation of *Jacobson v. Massachusetts*, 197 U.S. 11, considering the COVID-19 pandemic. As stated in the introduction—and it bears repeating—there is no COVID exception to the Takings Clause. In fact, there is no exception for any reason—when a physical taking occurs, "a simple, *per se* rule" applies: "The government must pay for what it takes." *Cedar Point*, 594 U.S. at 148; *cf. S. Grande View Dev. Co., Inc. v. City of Alabaster, Alabama*, 1 F.4th 1299, 1311 (11th Cir. 2021) ("An inquiry [into the purpose of regulation] is logically prior to and distinct from the question [of] whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose." (alterations original) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005))). And nothing "other than our usual constitutional standards" applies during a pandemic. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 25 (2020) (Gorsuch J., concurring).

The district court in its written order thus improperly read *Jacobson* to stand for the proposition that "the existence of a public-health emergency is a factor in the analysis." But *Jacobson* had nothing to do with the Takings Clause. *See id.* at 22–39. Justice Alito has observed that "*Jacobson* primarily involved a substantive due process challenge to a local ordinance requiring residents to be vaccinated" for smallpox. *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting from the denial of application for injunctive relief) (discussing *Jacobson*, 197 U.S. 11). He cautioned that "it is a mistake to take language in *Jacobson* as the last word on what the Constitution allows public officials to do

during the COVID–19 pandemic." *Id.* That is especially true in the Takings Clause context, where we presuppose that "the government has acted in pursuit of a valid public purpose." *S. Grande View Dev. Co.*, 1 F.4th at 1311 (quoting *Lingle*, 544 U.S. at 543). Here, the district court appears to have conflated a consideration of the Fifth Amendment's "public use" requirement with its "just compensation" mandate. Even if Walton County had a legitimate reason to physically appropriate the Landowners' property, Walton County "must pay" for what it took. *Cedar Point*, 594 U.S. at 148.

Overall, the normal requirements of the Takings Clause remain in force, even during emergencies. And under our usual standards, the taking at issue here is clear: Walton County barred the Landowners from entering and remaining on their property, and Walton County subjected the Landowners' property to repeated physical invasions to enforce that exclusion. Applying the "traditional legal test associated with the right at issue," *Roman Cath. Diocese*, 592 U.S. at 24 (Gorsuch, J., concurring), we hold that the Landowners are entitled to "just compensation." U.S. Const. amend. V.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of the Landowners' claims for prospective relief. But we reverse the district court's judgment in favor of Walton County on the Landowners' Takings Clause claim, and we remand with instructions to enter partial summary judgment in favor of the Landowners on their Takings Clause claim. On remand, the district

21-13999                Opinion of the Court                27

court shall also consider the amount of "just compensation" that the Landowners are entitled to under the Takings Clause.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.**